Good morning, ladies and gentlemen. Our first case for this morning is Reid against Unilever and others. Mr. Nutley. Thank you, Your Honor. Good morning, and may it please the Court, I'm Ben Nutley, representing Appellant Tina and Mark. I'm, of course, happy to answer any questions, but in the absence of those, I would like to maybe step back a little bit and talk a little bit about the job that this report was meant to do when analyzing this settlement and what it did versus what it should have done. What you've heard now from the settling parties at this point is that this is a great settlement because the injuries were not as severe as other injuries might be. That there were plenty of people who purchased this product, this hair smoothing product, who either liked it or weren't injured by it, who continued to purchase it even. So that even though there were some people who were harmed by this, allegedly, that there were substantial people who weren't. So I have two questions for you. Are you arguing, essentially, that this never should have been certified as a class? That's my first question. And the second question that I'm just confused by is I don't know why, if your client was this unhappy with settlement, she didn't just opt out as 52 people did. Okay, Judge Wood, let me try to answer the first question first, which is do we think it shouldn't have been certified as a class? I'm not arguing that it could never be certified as a settlement class. I think there would be substantial issues with certifying a class like this to go forward through trial. The Supreme Court has said we're not supposed to draw that sharp a distinction between ordinary class certification and settlement classes. That's correct. Amchem, Ortiz, you know, the courts was fairly clear. That was one of the issues, actually, in those cases. That's right. The idea is when it's a settlement class, you give much more scrutiny to the fairness of it rather than the manageability. It might be a way to put that. Whereas if this went forward as a litigated class, there would definitely be issues of manageability and probably all kinds of typicality issues as well. Well, then I don't see how it could be certified as a class, even for settlement, if you think that there are typicality problems. Well, I think there are. Well, and I do mainly because the named plaintiffs here suffered pretty severe injuries relative to what we're hearing about now is the average. They said... But, of course, the structure of the settlement reflects that. They're the option A, option B, option C avenues. Correct. But the... Well, let's talk about option A, which is the $10 reimbursement for your purchase, which you can get a one-time $10 reimbursement for it without even a receipt. But the complaint, the operative complaint, talks about a great deal that this product was alleged to contain a formaldehyde-like substance or a substance that released formaldehyde, while at the same time the package and the marketing was there's no formaldehyde in this. And so you could have people who purchased this a dozen times, like listen to the settling parties, some people liked it and weren't affected adversely with injuries. Perhaps they liked the product, purchased it once a month for a year, used it... Why are we that worried about those people? If they purchased it, had no problem with it, and went back and purchased it another 11 times, I'm confused as to why that... Those people are the people who may not have been aware that they were being exposed to formaldehyde, as the complaint alleges. Suddenly, when settlement comes, those people who... And they may, at the end of that, were they aware of the formaldehyde issue? They may have said, oh man, I never would have purchased that over the course of a year. I mean, no one, as far as I can tell, that it's carcinogenic or something. This case is about people who suffered either hair burning off or worse problems, as apparently some people did from this product. Your client said nothing at the fairness hearing about any particular injury she'd had. Right. There was a bit of confusion about what injuries she had, whether they were economic or otherwise, which didn't quite fit in with... It struck me as a problem, actually, that there's no record at all on that. Well, you know, what I would say about that is we were not instructed to... In the settlement notice and the provisions for filing an objection, it doesn't say anything about listing out your injuries. Our client filled out a declaration that listed all of the things that she was supposed to list, said that she is a member of the class, purchased the product. I don't believe it. I agree that it's not on the record. I think her injuries were, in fact, minor, but they existed. But that's, I don't think, I agree, I don't think that's on the record at all. And that's why I'm talking about the economic injury relative to the reimbursement. But let me just cut to the chase. Part of your brief makes me think that you think this is not a big enough settlement, that $10 million isn't going to cover the appropriate number of claims. And part of your brief makes me think that you think that the $10 million is going to be ample and that actually Unilever is going to wind up, once things move from the reimbursement fund to the injury fund and then the injury fund maybe only gets used to the tune of $6 million, the other four will go back to Unilever. So what is it? Is it too small or too big? It's both, actually. It can't be. And the reason I say that, well, let me explain it, because it is a little bit subtle. The process for claimants to claim this money, and this is what I'm talking about also with the reimbursement fund as well, there's some easy little money that anybody can get, whether you purchase it or not, as long as you're willing to swear out an affidavit that you did. And then there's the larger amounts, which are inexplicably capped to us. They're capped because it was a settlement. I don't know why you think that's inexplicable. Well, it's inexplicably low, I suppose I would say, for some people who surely... But maybe not for your client. Maybe she's in the $800 range. I mean, we don't know, but there are some people, apparently, who suffered something but not a huge amount. That's right, and those people should have a chance to get that as well. And they will under this settlement structure. There's the administrator, then there's the claimed settlement person, former magistrate Judge Nolan, for the $25,000 people. Now, I understand there's some people who might think they had $50,000 worth of damage, but that's what settlements look like, actually. They're compromises. That's true, and to go back to a comment you made before, Judge Wood, that this case is about personal injury. It really didn't start out that way, to be all about personal injury. It's about the sale of this product that was mislabeled, didn't identify its ingredients properly, and also happened to allegedly cause these injuries. So there's more than just a personal injury component, and in fact... But we're here at the settlement evaluation stage, and you're trying to put this into the box that some of our cases have fit into, namely something where there's not a sufficient inquiry by the district judge. I think the district judge did look at it pretty carefully. We don't have the problem with the attorney's fees coming out of the settlement. We don't have a lot of things that have been issues before. That's true. The district court made a real effort, I think, to address the Eubank versus Pella, which is the latest case to talk about that. But I think most of what Judge Castillo did there was to look at the total number of claims, and then the total amount of the settlement, and say, well, how many claims do you have right now? How many claims are you likely to have at the end of this? And he extrapolated. It was about halfway through the, maybe two-thirds of the way through the claims submission period, so he had some data to look at. Correct. But that is just really only half of the question. And our issue with this was not so much there's this amount of money here to be claimed, so much as how are we going to get fairly from one side to the other of this, meaning it's the process that people would use. Again, why didn't she just opt out if she thought she had a huge claim or something? I just don't see what's wrong with the process. I don't think she does have a huge claim, and I think that's. . . So what does she, in your world, what would this look like? Because people who, when we say to people. . . Tell me exactly how you think this settlement should have been structured, and then tell me how that differs from how it was structured. Okay. Let me, if I could, answer the first. . . That's really what I want to know about, so please don't answer a different question. Well, I don't. . . It would be a long discussion to talk about each point about how it should have been structured differently. What I think is. . . Give me your top three things that you think are wrong with this settlement structure that you would have thought. . . And you're actually saying the district court abused its discretion in not insisting on these things, whatever they may be. That's right. What are they? What are your top three things? Well, you would want to. . . I think we would say that the claims for reimbursement for purchase price should be. . . There should be a larger. . . There should be a way to. . . If you have receipts for 12 purchases and you can say, now that I know about this formaldehyde issue, I don't want to. . . I feel like I was ripped off. I want to make a claim for 12 times my purchase price. That's that part. With the injuries, we have a process where people are throwing their information into a black box. There's an adjudicator who's going to look at it. The defense can supply what they call factual information. They assert that they can't assert legal defenses or something to that effect, that the settlement precludes that. I couldn't find that anywhere. I've yet to see an attorney mention a fact without tying it in some way argumentatively or to a law. Why would a defendant just spew facts at the adjudicator? But the claimant has the opportunity to come back with other information, and we know what law it is. It says it's going to be governed by Illinois law. I don't know that that's any worse a black box than any other submission of a claim. Are these claimants represented by lawyers necessarily who can? No. Exactly. I mean, they could be. Why not? Does it preclude them? Does it say you may not have a lawyer? I don't think so. No, it doesn't. But there is very little incentive for a private lawyer to undertake that adjudicative process when the cap is $25,000, when they are essentially going to be hamstrung from discovery. They are never going to find the email that says just ship it. They're never going to find that. There's no discovery. Well, that's because the case was settled. That's what would have come out had it been litigated. That's right, and that's why we're saying maybe it should have been litigated a little more if we don't know the answer to that. And that, I think that merely, Eubank v. Pellitt doesn't just say compare the total to the amount to the amount that's on offer, the number of claims versus the amount that's on offer. I think there's an issue, and it was Eubank v. Pellitt where Judge Posner says this is just a contingent claim. This hasn't been settled for real money. This is what they have for the most part are contingent claims, and that's not really the same thing as settling the claim. What you've done is sort of kick off the claims, structure a way for them to be managed in a very boxed-in way without reference to the multiplicity of different state laws or doctrines that could govern those claims. Now, Judge, you asked about why not opt out, because if you've got a $50, $100, $10 claim and you opt out, you lose the benefits of the economies of scale from a class action. I understand that. Yeah. Okay. Well, if you want to save a little rebuttal time, that's where you are. Well, indeed. Thank you. Thank you. Mr. Saferstein.  Thank you. Good morning, colleagues of the court. I am Peter Saferstein, and I am counsel for the class here and also obviously representing one of the appellees. Your Honors, this settlement provides real and substantial value to the class. The $10.25 million settlement that was approved by Judge Castillo after examining the record in detail is fair, adequate, and reasonable. And there is nothing in the record that the objector can point to that shows an abuse of discretion over here. I have three initial observations. One, many factual assertions that are made by the objector in the brief and even in oral argument are just not correct. They don't accurately reflect the settlement agreement and do not accurately reflect the record, which I'll deal with momentarily. Two, second observation. This objector is actually holding up the providing of real value to thousands of individuals, including a number of people who were injured, and stands between those individuals getting real value and real dollars for their injury as a result of having been part of the settlement class here in this case. Third, this objector has a dubious standing. One, as the court asked, as Chief Judge Wood asked, in your world, what would be different over here? The fact of the matter is there really hasn't been an articulated injury over here. There is nothing that would benefit the class or would benefit the objector by scuttling this settlement. Nothing. Two, there is a serious issue here about standing even beyond that on two specific grounds. One, which deals with the challenge to the releases. The objector did not file a release, so it doesn't really have standing to challenge the release. They're excluded anyway from the class, aren't they, the people who? They are, but it was part of his argument. Yeah, it's specifically excluded in the definition of the class. The last point here is with regard to the challenge to attorney's fees. The attorney's fees are paid separate from the class. It will not diminish the value of the class whatsoever. What's the status of that in the district court? Is that finished? Yes, it's been finished. Earlier this year, on June 10, 2015, there was an opinion issued by the court. We had asked for a third of the value of the settlement. It was opposed. Actually, the settlement agreement provided that we would resolve attorney's fees based upon the work performed, and that is what Judge Castillo looked at. Judge Castillo looked at what the work that was performed in this matter. He also looked at how many claims had been made because the period of time had expired by that point and actually looked at our load star and then cut our load star significantly. So we have actually, as attorneys in this case, made substantially less than we would have made if we had simply gotten our load star, and that's been resolved. Importantly, this was done on June 10, 2015, and despite the fact that there have been all these complaints about the process involved over here with regard to the attorney's fees, the time to appeal the actual award of attorney's fees has passed, and there's been no appeal that was made either by this objector or by anyone else. But importantly also, by not having made a claim, and when we serve discovery in this matter, and we can supplement the record if the court desires, by not having made a claim in this case, there is no justiciable standing over here to object to the fee when the fee is not part of the settlement class. When the fee is independently represented and there's no claim made, then she's not part of the class and doesn't have standing to object. Let's talk about the record. The record in this case was very precise and very, very detailed. Judge Castillo made, and all of this is on the record, Judge Castillo took painstaking steps to make sure that this was analyzed in accordance with Seventh Circuit precedent, and as you know, the opinion at Pella had just come down shortly before this final approval hearing. It was fresh on everyone's minds. The attorneys who were arguing for the settlement made clear reference to Pella and the judge very clearly referenced Pella in his opinion. And after evaluating all of the factors under ISB and looking at specifically through the lens of Pella, this is Judge Castillo's words, the judge determined that the factors, quote, overwhelmingly support final approval. This was hard-fought litigation. It was at arm's length. There was no conflict of interest here whatsoever. The settlement was reached only with the assistance of a very able mediator, Judge Anderson, formerly of the Northern District of Illinois. This case had survived two motions to dismiss, a motion to dismiss in the Northern District of Illinois and a motion to dismiss in Kentucky. The judge knew this case intimately. The judge said that evaluating all of the factors, it faced looming, long, arduous litigation. He understood there was a causation issue over here that he said was a hurdle. He said that perhaps we could achieve causation, but was going to reserve judgment to the final analysis and said that there were issues here with regard to liability and with regard to damages in the long run. The objector in answering your question, Chief Judge Wood, said very clearly it's not challenging certification over here. This case could have been certified. That's not an issue and that's nothing that they raise over here. This was a balancing effort that was done. There are only two objectors. One objector has dropped out. The judge received detailed evidence of the very robust notice plan in this case, and there's no challenge to that. And seriously injured people can and have, in fact, opted out of this case. Going back specifically to what Mr. Nutley just argued, if you were seriously injured and you believe that your damages were $50,000 or above, you had the option to opt out. It was very, very clear, and they had that opportunity. With regard to they argue in the brief about valuations before the court. I'm going to skip that right now because I believe it's very clear that there were valuations. With regard to the special master, it was not a burdensome claims process. The language that Mr. Nutley says he can't find is in 4C2 of the settlement agreement, and it says that Unilever can only provide information. This is not a claims process that involves an adversarial process. They have waived their defenses. The only thing that they can provide Magistrate Judge Nolan with is information that they have in the ordinary course of business. They have to show it to us first. They have to show it to the settlement administrator. And I'm very much involved in this case, and I can represent to the court that this process has been very, very helpful because there are many people who are making claims that do not have information in their possession, and they are getting that information by going to Unilever, which has evidence of the fact that they called up to complain. They have pictures that were submitted by these women and individuals who've lost hair, who've had burnt scalps. They're getting that information. And what they can do is they can appeal and ask, not appeal, but they can request that the special master give them an award for injury for up to $25,000. One last final point. There are two components to this settlement. It was misrepresented by my adversary over here. There is a reimbursement component, and then there is an injury component. The reimbursement component provides for $10. For a $13 product, it's 80% of the value. If you represent, you don't have to have a receipt. You represent that you bought the product. It's just an affidavit, basically? Basically, yes. You get $10 back. And that's for the $250,000 fund. If there is money left over in that fund, and there is, that money then goes into the injury fund. Three components to the injury fund. If you say that you're injured, you do not have receipts, you get $40 based upon the fact that you may have gotten a haircut, you may have needed to buy some lotions or some sort of medical treatment. If you have receipts, and even if you don't have receipts, but you can show some affidavit and some proof, you can get up to $800. And if you have more serious injuries, and you can follow the guidelines, which are specifically incorporated into the settlement and provided to Magistrate Judge Nolan, then they get up to $25,000. It's not an adversarial procedure. This is what's done in many settlements across the country when there are people who are injured, and when the parties agree that it's time to make a real effort to provide real value to people who have been injured. That's what this settlement does. And this settlement should be sustained. Judge Castillo did everything he needed to do. Thank you. All right, thank you very much. Ms. Morensi. Good morning, Your Honors. In this case, the district court applied every word of the guidance that this court provided in Pella and other class actions, as Mr. Stafferstein has already explained. In more detail, the court below first determined there were no conflicts, looked at the risks and benefits to the class from the settlement, and concluded that it was fair, reasonable, and adequate. What is important, I think, for this case is to note what this case is not as well as what it is. This is a case that results in relief not in the form of coupons but in cash. It is a case where the settlement was hard fought and negotiated with the assistance of a mediator, not where there was any collusion. It is a case where the court diagnosed a straightforward path to relief for those who presented the option C claims for personal injury. It is not a case that involved complicated forms. These forms are two pages long. The individual claimants are allowed to submit anything they wish to the former magistrate judge. They can submit videos, declarations, affidavits from their family members, affidavits from beauticians. All of this is available, and there is no provision for the parties or their counsel to be present when the magistrate judge reviews this information. So the special master is looking at the evidence that is submitted to her and has only factual information from Unilever, which has taken two forms. Mr. Safferstein has already explained one of those forms, and that is the factual information that the beauticians at Unilever received when someone had a problem with hair breakage and asked, What should I do about this? Frequently the only photos were in Unilever's hands. But the second piece of factual information is an important one, and that is the releases that Unilever had negotiated with 426 individuals, some of whom submitted again for claims in this class. So that factual information that removed them from the class definition is also before the magistrate judge, and appropriately so. I would like to focus for just a moment on the risks that the district court looked at in approving this settlement for the class. The risks were substantial. The common scientific issues that the plaintiffs were urging were a problem for the class because, as explained in our brief, the plaintiffs got the science wrong. Given the testing that was done on this product and the expert report that said a pH at this alkaline level is perfectly safe if applied as directed, the plaintiffs were going to face an uphill battle on the scientific issues if this case proceeded. And although the objector claims now from the complaint that there was formaldehyde in this product, the evidence produced in discovery was that there was no formaldehyde added to this product, that the only formaldehyde releaser, which is chemically different, is a preservative in the conditioning step that is in most conditioners across the country today. So, again, what this case is not. It is not a case where someone was exposed to a carcinogen or a toxic substance. It was a case in which people sought reimbursement for the product and some compensation for the haircuts if they applied the product contrary to instructions, and that is largely what happened. Does the complaint mention formaldehyde? The amended complaint does, Your Honor. In this case, the most common injuries resulted from a disregard of the instructions on the box, which said this product should not be applied to previously highlighted hair. And given how many women in America had highlighted their hair, there was hair breakage and frizz that resulted. And in many cases, as class counsel pointed out at the final approval hearing, a haircut was the appropriate remedy. But not to minimize the injuries that some did suffer, if, again, contrary to instruction, they massaged it into their scalp, there is a remedy for personal injury up to $25,000. Two words on that $25,000, Your Honor. It was heavily negotiated, but it was also heavily substantiated because after the objector raised that issue at the final approval hearing, the very last exhibit admitted at the final approval hearing was a chart of representative examples of prior awards and judgments for non-permanent hair damage. None of them exceeded $25,000, and the court looked at that before issuing the final approval order. But also, just to note something that harkens back to some statements Judge Posner has made in the past, he often describes a defendant as indifferent economically to how a settlement plays out. But here, Unilever has consistently taken the position that it has an investment in its brand and in the goodwill of its consumers. It's not a company like Radio Shack that was facing bankruptcy. It's a vibrant and ongoing commercial enterprise. Unilever was very interested and focused on making sure that someone who relied on its brand was getting a fair, adequate, and reasonable response to an adverse experience that they had with this product. And therefore, this settlement fund is, in many respects, more generous than would have resulted from simply adding up the categories of relief. Today, Your Honor, the claim rate is between 2.3% and 2.5%, which is five and six times what we have seen in other cases that have come before this court. Well, the claim rates are always quite low, except that, I mean, it did seem that the notice procedure reached a great number of people. It did, Your Honor, and in this case, the claim submissions reflect that. We've already talked about the claim submission process. The notice scope, I think, is fully addressed in our brief, but there were 87 million banner ads. There were 70 million Facebook postings. There was direct mail to anyone who had contacted Unilever about this product, even to praise it. There were emails of 3,500. There were notices to the attorneys general. There were ads in magazines. They essentially used the settlement administrator used the same channels that Unilever had used to promote the product in the first place before the recall. Because the court properly assessed the risks and the benefits and properly rejected the objections below, we urge the court to reject the objections again and affirm this settlement. Thank you. All right, thank you very much. Anything further, Mr. Nutley? Yes, Your Honor. Let me start with the defense's latest last point, that there was a relatively high claims rate relative to other cases that you see in this case. The problem with using that number for analysis or information is that this is a case, as we know, where you can make a claim without a receipt. You can just verify that you purchased the product and obtained money. For some of the injury component, you have to provide more information, of course, but you can make a basic claim with just an affidavit. There are websites that tell people on the Internet to aggregate these settlements up and tell them, you can get money in this. All you have to do is fill this out. Say you purchased it. They're not going to check. And the more, in that sense, the more notice you have, the more Internet notice, the more notice you have of that, the more likely it is you're going to get a substantial number of just simply fraudulent claims. Do I have any information that any of these claims is fraudulent? When somebody signs up for the $10 thing, fills out the claim form, and sends it in, even though they didn't purchase it? No, I don't. But I suspect that the parties don't either. So that is not a very useful piece of information, the claims rate in this situation. Going back to what Mr. Safferstein described as an inaccuracy in my description of the settlement, the settlement does not say anywhere in Section 4C or anywhere else that the defendant is waiving its defenses. It says that it may provide information of a factual nature to the arbitrator. That is different from saying that it's waived all of its defenses. And, of course, there is, of course, the release issue that some people, plaintiffs alleged in their complaint that these releases were obtained, I don't think the word was fraudulently, but that the releases had been obtained, that they were unconscionable was the phrase. And yet they're going to be able to, they're not waiving that defense, that's for sure. And so I don't see any, if the defendant can provide factual information to the arbitrator, how does that work? They simply aver a few facts without any argument or reference to law that says, well, we think this person purchased this in Argentina rather than in the United States, and then just back off and wait for the arbitrator to take that information. What does the arbitrator do with that information? Is she supposed to go back and say, oh, well, this only applies to people who purchased it in the United States, so you're out without any explanation?  That's the argument. There's just a lot of practical, how is that going to work, issues with respect to submitting facts in opposition to a claim. The standing issue, I just want to, or let me, so Mr. Staffordstein said that Ms. Martin hadn't appealed the attorney's fees order, and that's true. There's no reason to. When you're challenging the settlement itself, the attorney's fees order would fall if the settlement falls. So it would be deemed, I believe, vacated. If the order upon which it is based is vacated, then the fee order is vacated. No need to challenge it if you're challenging the settlement. Also, with regard to standing, saying, well, she didn't file a claim, and so that does not deprive you of standing when you're challenging the settlement. Cases have found, there's a case in the Ninth Circuit that says if you haven't challenged, if you're challenging the fee only, and you haven't filed a claim, and therefore, if the fee is lowered, you won't get any more money back, because you haven't challenged the settlement, or you haven't, I'm sorry, you haven't claimed, so you don't stand to make any more. But if you're challenging the entire settlement, and the settlement goes away, that's not an issue. So there is no standing issue. It's absolutely frivolous, and we've tried to explain this time and again, and yet they keep repeating that, and it's pretty frustrating, actually, because it's pretty clear. And the final point to make is that, where Mr. Safferstein says, well, there's, if there's money left over from the $250,000 fund, that will pour over into the injury fund. Of course, that's part of the problem. What we're saying is that some of the reimbursement should have been taken more seriously as well, and not just give somebody a $10 reimbursement, and then have the rest of it pour over into the injury fund. So those are the... Okay. In fact, one more point on standing, just to hammer this home. This circuit has already said that you have standing when the attorney's fees are being paid separately from the fund. That was the Pearson v. MBTY case where Judge Posner derided this. We don't have attorney's fees before us here, though. Correct, but this was a standing point. Right. The point of standing saying that she wouldn't benefit, my client wouldn't benefit from winning, because the attorney's fees wouldn't be any lower because they're being paid separately. That's not accurate. That's not correct, the way of looking at that. And, in fact, courts have looked at attorney's fees being paid separately, and Judge Posner derided it as a gimmick to attempt to deprive objectors of standing. So that's been very, very well, I think, put to bed. So that's all I have. All right. Thank you very much. Thanks to all counsel. We'll take the case under advisement.